# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
    *ex rel.* Charles E. Moore,

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>v.</td><td>:</td><td>Civil No. CCB-12-1824</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>CARDINAL FINANCIAL CO., L.P., et al.</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
</table>

## MEMORANDUM

Charles E. Moore, a former mortgage broker, originally brought this claim against Cardinal Financial Company, L.P. ("Cardinal") and others as a *qui tam* relator on behalf of the United States under the federal False Claims Act. Moore's former attorney, Jason Rheinstein, claims to have obtained all rights, title, and interest in the lawsuit and has continued to prosecute this *qui tam* action as a "successor in interest."[1] Seven of the ten named defendants have filed motions to dismiss, while three have not filed responsive pleadings. For the reasons explained below, the defendants' motions to dismiss will be granted.

## I. BACKGROUND

The federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, generally makes liable to the United States "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the government. *Id.* § 3729(a). Private persons may act as relators and bring a civil action on behalf of the United States. *Id.* § 3730(b). The relator must first file suit under seal, giving the U.S. government time to investigate the claim

---

[1] To avoid confusion, this memorandum refers to "Rheinstein" when discussing actions taken by Jason Rheinstein, and "Moore" or "the relator" when referring to actions taken by Charles E. Moore.

and choose to either intervene in the action or allow the relator to proceed on his own. *Id*. The action is then unsealed and notice is provided to the defendant. If the action is successful, the relator receives a percentage of any proceeds. *Id*. § 3730(d).

This FCA case centers on an alleged scheme in which ten named defendants, acting in concert, fraudulently procured mortgage insurance from the Federal Housing Administration ("FHA") in 27 separate mortgage transactions ("subject transactions"). The loans in the subject transactions were originated between July 2009 and November 2010, and the fraudulent scheme allegedly could cost the government $2.6 million. (Am. Compl. ¶¶ 3, 8, ECF No. 21).

A. FHA Mortgage Insurance

FHA mortgage insurance protects commercial lenders against defaults on mortgage payments and thus encourages these lenders to make loans to borrowers who might not meet conventional underwriting requirements. (Am. Compl. ¶¶ 15, 35). At the same time, FHA only accepts a fixed level of risk, and a mortgage must meet certain requirements in order to qualify for mortgage insurance. These requirements relate to, *inter alia*, the borrower's income and creditworthiness and the valuation of the property subject to the mortgage. (*Id*. ¶¶ 15, 36).

In order to expand the number of homeowners (and lenders) that the FHA insurance program can benefit, the program is implemented through the Direct Endorsement Lender ("DEL") Program. (*Id*. ¶ 16). Under this program, the federal government "does not itself conduct a detailed review of applications for mortgage insurance before an FHA-insured mortgage closes." (*Id*. ¶ 37). Instead, government-approved commercial lenders – known as direct endorsement lenders ("DELs") – are tasked with determining if a potential borrower qualifies for FHA insurance. If so, the DEL closes the loan with the borrower and submits

documents to the government certifying that the mortgage qualifies for FHA insurance. FHA then endorses the loan based on the DEL's certification. Accordingly, DELs obligate the government without independent government review. (*Id.* ¶¶ 37–39).

If a borrower defaults on an FHA-insured mortgage, the holder of the mortgage – which could be the DEL or a third party – may submit a claim to the government for the costs associated with the defaulted mortgage, and the government covers those costs. (*Id.* ¶ 40).

B. Alleged Fraudulent Scheme

The relator  -- and now Rheinstein, acting as a purported successor-in-interest – claim the defendants exploited the FHA insurance program by arranging sales of residential properties in Baltimore City, Maryland, to straw purchasers at inflated prices and fraudulently obtaining FHA mortgage insurance in connection with these sales. (Am. Compl. ¶¶ 50–75).

The alleged scheme had three elements. First, certain defendants owned residential properties in Baltimore City. (*Id.* ¶¶ 53–55). These defendants, acting in concert with others, recruited and paid straw purchasers to act as named borrowers for FHA-insured mortgages that were originated by DELs. (*Id.* ¶¶ 55, 62). These straw purchasers should not have qualified for FHA mortgage insurance, partly because they had neither the capability nor the intention of repaying their mortgage loans. However, they qualified because defendants provided the DELs with "false information and phony documents" on behalf of the straw purchasers. (*Id.* ¶¶ 57–61). With mortgage insurance in hand, the straw purchasers qualified for substantial loans, which they used to purchase the properties at inflated prices. (*Id.* ¶ 53). The straw purchasers soon defaulted on their mortgage payments, and the properties entered foreclosure proceedings. But because the government had agreed to insure these mortgages, all losses associated with

foreclosure proceedings were borne by the federal government. (*Id.* ¶¶ 64–72).

The ten defendants allegedly played different roles in this fraudulent scheme. Three entities – E&W Realty, LLC ("EWR"), National Homes, LLC ("National Homes"), and KMJ Realty, LLC ("KMJ") – owned and sold all but one of the properties at issue here. These three entities were allegedly under the sole ownership and control of a fourth defendant, Kathryn Jewell; collectively, these four defendants are referred to as "the Jewell defendants." (*Id.* ¶¶ 26–29). Defendant Boomerang Properties, LLC ("Boomerang") was the seller in one of the suspected fraudulent transactions. (*Id.* ¶ 32). Defendant Robert S. Svehlak is allegedly one of two individuals who owns and controls a real estate and lending enterprise comprised of Boomerang and several other companies. (*Id.* ¶ 33). Defendants Ronald Miles and Jonathan Lee Miles both worked for Transatlantic Mortgage, LLC – a now-defunct company that allegedly served as the broker or originator for all the subject transactions. (*Id.* ¶¶ 30–31). Cardinal Financial Company, L.P. ("Cardinal") served as a DEL and as the original mortgage lender for loans in the subject transactions. (*Id.* ¶ 24). Most subject transactions originated by Cardinal were then assigned to defendant Wells Fargo Bank, N.A. ("Wells Fargo"). (*Id.* ¶ 25).

The amended complaint details how this scheme operated with respect to one particular transaction involving the sale of a property located at 2138 Hollins Street in Baltimore, which the amended complaint refers to as Case No. 19 of the 27 subject transactions. Moore formerly owned this property but conveyed it to Boomerang, a defendant here, in 2009. (*Id.* ¶ 78 n.7). Boomerang then allegedly sold this property to a straw purchaser for $122,000. (*Id.* ¶ 93). The proof that this transaction was fraudulent, according to the amended complaint, centers on a form known as a HUD-1 settlement statement.[2] This statement must be prepared at the closing of every real estate

---

[2] HUD refers to the U.S. Department of Housing and Development. The FHA is an agency within HUD.

sale transaction involving an FHA-insured mortgage, and it must itemize all charges imposed on the buyer and seller in connection with the transaction. "For any given legitimate transaction," the relator stresses, "there can only be one version of a HUD-1 settlement statement because there can only be one true and accurate accounting of the funds which are received and paid out in connection with that specific real estate transaction." (*Id.* ¶¶ 95–97). The HUD-1 settlement statement is one of the documents that a DEL must submit to the federal government in order to attain final approval for the FHA-mortgage insurance. (*Id.* ¶ 97).

With respect to the sale of the Hollins Street property, and perhaps others, the amended complaint claims two versions of the HUD-1 settlement statement were produced "in order to deceive HUD about the true disposition of the mortgage loan proceeds that financed the transaction." (*Id.* ¶ 98). With respect to the Hollins Street property, the "accurate" version of the form allegedly reveals that Boomerang gave $68,740 of the sale proceeds to defendant EWR. (*Id.* ¶ 100). Especially because the property only sold for $122,000, the relator claims this is far too high for a brokerage fee and that the $68,740 payment instead reflects the fact that EWR had identified and recruited a straw purchaser pursuant to the alleged scheme. (*Id.* ¶ 107). The second version of the form, also attached to the complaint, simply omits this $68,740 payment. The existence of the two forms – only one of which contains an "exorbitant" consulting fee paid to EWR – "would have made it blatantly obvious to anyone that the transaction was not legitimate," according to the amended complaint. (*Id.* ¶ 112). The amended complaint further claims that Cardinal received *both* versions of the form and chose to submit to the government only the version omitting the $68,740 payment. (*Id.* ¶ 111 ).[3] According to the amended complaint, the

---

[3] The amended complaint also claims Wells Fargo received both versions of the HUD-1 settlement form and essentially blessed the inclusion of only one version of that form when Cardinal submitted the final paperwork to the federal government. (*Id.* ¶¶ 153–59).

mortgage transaction for the Hollins Street property closed on April 29, 2010. Roughly two weeks later – on or about May 10, 2010 – Cardinal submitted the final paperwork (including the "false" HUD-1 settlement statement) to the federal government and then assigned its security interest in the property to Wells Fargo. (*Id.* ¶¶ 146, 155). After the straw purchaser defaulted, Wells Fargo initiated foreclosure proceedings in October 2011, and subsequently made a claim on the FHA insurance in or around September 2014, and the federal government indemnified Wells Fargo for any losses in or about September 2014. (*Id.* ¶¶ 157–60).

The amended complaint alleges the remaining 26 mortgage transactions "followed the same pattern" as the sale of the Hollins Street property, but provides less detail. (*Id.* ¶¶ 162–89).

The present litigation concerns various alleged violations of the FCA. The amended complaint claims various defendants violated § 31 U.S.C. 3729(a)(1)(A), which provides for liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; § 3729(a)(1)(B), which provides for liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; § 3729(a)(1)(G), which provides for liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government"; and § 3729(a)(1)(C), which imposes liability on any person who conspires to commit a violation of the FCA. (*Id.* ¶¶ 210–97).

### C. Procedural History

The court will briefly summarize related litigation in state court before detailing the

procedural history of the present *qui tam* lawsuit.

The current *qui tam* litigation has its origin in a prior state court proceeding, *Imagine Capital, Inc. v. Charles E. Moore et al.*, Case No. 24-C-09-003634 (Balt. City Cir. Ct.) ("Confessed Judgment Action"). That dispute centered on a construction loan provided by Imagine Capital – which is owned by Robert Svehlak, a defendant here – to Moore. After Moore defaulted on his loan repayments, a confessed judgment was entered against him in state court in June 2009. (Pl.'s Resp. in Opp'n to Mot. to Vacate, Confessed Judgment Case, Am. Complaint Ex. 7, ECF No. 21-8, 2–3). In light of his debt to Imagine Capital, Moore agreed to convey a property he owned – the 2138 Hollins Street property – to Boomerang, a company owned and controlled by Svehlak, on September 23, 2009. (*Id.* 3–4; Def.'s Mot. to Vacate, Confessed Judgment Case, Boomerang Mot. to Dismiss, Ex. A, ECF No. 29-4, 7–8). But the two sides then disagreed as to whether the conveyance of the 2138 Hollins Street property fully satisfied Moore's debt. (Pl's Resp. in Opp'n to Mot. to Vacate, Confessed Judgment Case 4; Defendant's Mot. to Vacate, Confessed Judgment Case 8–9). In light of that disagreement, Moore attempted to vacate the confessed judgment against him, and Rheinstein served as his counsel. (*See* Defendant's Mot. to Vacate, Confessed Judgment Case). Moore and Rheinstein first became aware of the alleged fraudulent scheme at issue in the current *qui tam* lawsuit in the fall of 2011 in the context of this Confessed Judgment Action in state court. In particular, they claim that Svehlak submitted a "suspicious exhibit" in the Confessed Judgment Action that tipped them off to the fact that Boomerang and others were engaged in mortgage fraud. (Am. Compl. ¶ 23).

Moore, as relator, filed the current *qui tam* lawsuit on June 20, 2012, with Rheinstein once again serving as counsel. (Compl., ECF No. 1).[4] On February 20, 2013, however, Moore and his wife filed a joint voluntary petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code. (Am. Compl. ¶ 23 n.2). As of February 20, 2013, then, it is alleged that all rights, title, and interest previously held by the relator in this *qui tam* lawsuit passed to the estate, and separate counsel (not Rheinstein) was appointed trustee. (*Id.*). While the trustee held the rights to the *qui tam* lawsuit, the federal government noticed its decision not to intervene in the lawsuit on November 10, 2014. (First Intervention Decision, ECF No. 15). On November 17, 2014, the court ordered that the complaint be unsealed and served upon the defendant, although it did not specify a time for doing so. (First Order Unsealing Compl., ECF No. 16). On March 17, 2015, Rheinstein – who was no longer counsel in this *qui tam* action but who claimed he was executing the wishes of the trustee, who now held the rights to the lawsuit – moved to extend the time for service through September 12, 2015. (First Mot. to Extend, ECF No. 17, ¶¶ 15–19). The motion to extend was granted on March 18, 2015. (Order Granting First Extension, ECF No. 18).

After Mr. Rheinstein helped to secure that first extension on behalf of the trustee, all rights, title, and interest in the present *qui tam* lawsuit purportedly were transferred from the trustee to him on June 15, 2015. (Am. Compl. ¶ 23 n.2; Second Rheinstein Affidavit, Ex. 3, Notice of Assignment, ECF No. 39-5). Rheinstein had asserted a claim against Moore (and his wife) in the bankruptcy proceedings, and the transfer of rights in the *qui tam* case was meant to partially settle his claim. For that reason, Rheinstein now purports to continue the *qui tam*

---

[4] On July 13, 2012, Moore filed a second *qui tam* lawsuit in federal court, with Rheinstein again serving as counsel. That lawsuit – *U.S. ex rel. Moore v. Svehlak et al.*, 1:12-cv-2093-CCB, also alleges a variety of mortgage fraud and lists as defendants several of the same defendants involved here. This second *qui tam* lawsuit is still in the initial phases. The deadline for completing service of the complaint was extended through and including March 12, 2017. On March 12, 2017, Rheinstein requested a further extension.

litigation "as the successor in interest to the Relator and the Estate." (Am. Compl. ¶ 23 n.2). On September 12, 2015, Rheinstein – now as successor-in-interest – requested another extension, this time up to and including December 12, 2015. (Second Mot. to Extend, ECF No. 19), which was granted, (Order Granting Second Extension, ECF No. 20). Rheinstein did not serve the defendants by that date. Instead, he filed an amended complaint on December 12, 2015 – the same day service of the original complaint was due. (Am. Compl.). The next day – after the deadline for service – he filed a "*Motion to File Amended Complaint In Camera and Maintain Records Under Seal*." (Mot. to File Am. Compl., ECF No. 22). In that motion, Rheinstein asked the court to enter an order 1) permitting the amended complaint to be filed and docketed *in camera* and remain under seal, and 2) providing that the defendants "shall not be served until the Government has noticed its intervention decision." (*Id.* 4). That motion was granted on December 15, 2015. (Order Granting Mot. to File Am. Compl., ECF No. 23).

Meanwhile, the U.S. government had filed criminal proceedings against three individuals – Kevin C. Campbell, Jonathan Miles, and Alberic Okou Agodio – "in connection with the scheme that resulted in the fraudulent mortgage transactions at issue" in the *qui tam* litigation. The government filed a case against Campbell on November 29, 2012 – about five months after the relator had filed his original qui tam complaint. The government then filed cases against Miles and Agodio on July 2, 2014, and February 18, 2015, respectively. (Am. Compl. ¶ 190). The government entered three separate plea deals with these defendants on November 15, 2012, June 26, 2014, and June 29, 2015. (Am. Compl. ¶¶ 192, 199, 204 & Exs. 18, 19, 20, ECF Nos. 21-18, 21-19, 21-20). These plea deals were entered after Moore filed the original complaint but before Rheinstein filed the amended complaint in December 2015.

On February 16, 2016, the government declined to intervene with respect to the amended complaint. (Second Intervention Decision, ECF No. 26). Rheinstein then served the defendants with the amended complaint in the ensuing months.[5] Defendants Boomerang, Svehlak, Wells Fargo, Cardinal, Ronald Miles, Jonathan Miles, and Kathryn Jewell filed motions to dismiss on a variety of grounds. The remaining defendants – E&W Realty, KMJ Realty, and National Homes – have not filed responsive pleadings. Rheinstein has filed responses to most of the motions to dismiss, and the parties also have disputed other procedural matters related to these filings.

In particular, Boomerang and Svehlak filed a motion to dismiss or, in the alternative, for summary judgment on May 2, 2016. (Boomerang Mot. to Dismiss, ECF No. 29). An initial response was filed on June 1, 2016, (Resp. in Opp'n to Boomerang Mot. to Dismiss, ECF No. 41), and an amended response was filed on June 3, 2016, (Amended Resp. in Opp'n to Boomerang Mot. to Dismiss, ECF No. 45). Boomerang and Svehlak replied on June 21, 2016. (Reply, Boomerang Mot. to Dismiss, ECF No. 52).

Wells Fargo filed a motion to dismiss on July 15, 2016. (Wells Fargo Mot. to Dismiss, ECF No. 54). Rheinstein filed a response on September 26, 2016, (Resp. in Opp'n to Wells Fargo Mot. to Dismiss, ECF No. 109), and Wells Fargo replied on October 21, 2016. (Reply, Wells Fargo Mot. to Dismiss, ECF No. 115).

Cardinal filed a motion to dismiss on July 15, 2016. (Cardinal Mot. to Dismiss, ECF No. 56). A response was filed on September 16, 2016 (Resp. in Opp'n, Cardinal Mot. to Dismiss, ECF No. 93), and then a corrected response was filed on September 25, 2016, (Amended Resp. in Opp'n, Cardinal Mot. to Dismiss, ECF No. 102). Cardinal moved to strike the amended response on September 27, 2016, (Cardinal Mot. to Strike, ECF No. 107), which Rheinstein

---

[5] This case and a related case were transferred to me on October 7, 2016.

opposed, (Resp. in Opp'n, Mot. to Strike, ECF No. 108). Cardinal then filed a reply on its motion to dismiss on October 11, 2016. (Reply, Cardinal Mot. to Dismiss, ECF No. 112).

Ronald Miles filed a motion to dismiss on September 8, 2016. (Ronald Miles Mot. to Dismiss, ECF No. 79), and a response was filed on October 17, 2016, (Resp. in Opp'n, Ronald Miles Mot. to Dismiss, ECF No. 114). Jonathan Lee Miles filed a motion to dismiss on December 15, 2016, (Jonathan Lee Miles Mot. to Dismiss, ECF No. 123), and a response was filed on February 6, 2016 (Resp. in Opp'n, Jonathan Lee Miles Mot. to Dismiss, ECF No. 127).

Kathryn Jewell filed a motion to dismiss on October 5, 2016, (Jewell Mot. to Dismiss, ECF No. 111), and then filed a motion to amend her pleading to incorporate defenses raised by other defendants on October 17, 2016, (Jewell Mot. to Amend, ECF No. 113). A response to both the motion to dismiss and the motion to amend was filed on November 21, 2016. (Resp. in Opp'n, Jewell Mot. to Dismiss, ECF No. 122).

## ANALYSIS

I.      Insufficient Service of Process[6]

The defendants raise a host of procedural and substantive issues in their motions to dismiss, some of which overlap and some of which relate to their specific alleged roles. But defendants generally agree that the court should dismiss this action pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process.[7]

---

[6] A court must generally consider questions regarding jurisdictional issues before addressing the merits of the case. *See, e.g., Sucampo Pharmaceuticals, Inc. v. Astellas Pharma. Inc.,* 471 F.3d 544, 548 (4th Cir. 2006) ("[D]ismissal of a case on an issue relating to the merits of the dispute, such as failure to state a claim, is improper without resolving threshold issues of jurisdiction, including personal jurisdiction."

[7] Six defendants who filed responsive pleadings either raised this issue or incorporated it by reference from other defendants' pleadings. Jewell originally did not move to dismiss on these grounds, (Jewell Mot. to Dismiss), although she subsequently moved to amend her pleading to incorporate this argument. (Jewell Mot. to Amend.).

Rule 12(b)(5) provides that a motion to dismiss may be based on "insufficiency of service of process." The requirements for service of process are set forth in Fed. R. Civ. P. 4(c)(1), which states, "A summons must be served with a copy of the complaint. The plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m) . . . ." Rule 4(m), in turn, provides, in relevant part:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Rule 4(m) applies to FCA cases as well, *see Am. Civil Liberties Union v. Holder*, 673 F.3d 245, 251 (4th Cir. 2011). Because FCA cases initially are filed under seal, however, the 90-day clock does not start until the court unseals the complaint and orders service. *See* 31 U.S.C. § 3730(b)(3) ("The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure."). Here, the court unsealed the complaint and ordered service on November 17, 2014. But the court extended that deadline twice; the second extension mandated service by December 12, 2015. The parties agree that Rheinstein was obliged to effect service by that date, or else face whatever consequences may result under Rule 4(m). They disagree, however, on how Rule 4(m) should be interpreted. According to the defendants, the court must dismiss this action for insufficient service of process because Rheinstein failed to effect service by December 12. (*See, e.g.*, Boomerang Mot. to Dismiss Mem. Law, ECF No. 29-1, 15). Rheinstein claims dismissal is discretionary and, in any event, would be improper. (Amended Resp. in Opp'n to Boomerang Mot. to Dismiss 23–32).

Courts in this circuit have long debated whether they have discretion under Rule 4(m) to extend deadlines for service absent a showing of "good cause." In *Mendez v. Elliot,* 45 F.3d 75, 78 (4th Cir.1995), the Fourth Circuit interpreted Rule 4(m) as mandating dismissal if service is not effected by the applicable deadline and the plaintiff fails to show "good cause." That holding was subsequently put in doubt by other circuit courts and, in dicta, the Supreme Court. *Henderson v. United States,* 517 U.S. 654, 658 n.5 (1996). Especially in light of *Henderson*, I concluded more than 15 years ago that *Mendez* was not good law and that, "given the opportunity, the Fourth Circuit perforce would adopt the interpretation of Rule 4(m) held by the Supreme Court and the other circuit courts." *Hammad v. Tate Access Floors, Inc.*, 31 F. Supp. 2d 524, 527–28 (D. Md. 1999).

The Fourth Circuit has not clarified the matter in a published opinion since *Mendez*. In unpublished opinions since *Mendez*, it has endorsed both sides of the debate. *Compare Giacomo-Tano v. Levine*, 199 F.3d 1327, at *1 (4th Cir. 1999) ("Even if a plaintiff does not establish good cause, the district court may in its discretion grant an extension of time for service"), *with Martinez v. United States*, 578 F. App'x 192, 193–94 (4th Cir. 2014) ("A plaintiff may escape dismissal for failure to timely serve process only if she demonstrates 'good cause' for the delay.").[8] The more recent Fourth Circuit opinions, however, indicate *Mendez* is still good law. *See Martinez*, 578 F. App'x. at 193–94; *Chen v. Mayor & City Council of Baltimore*, 546 F. App'x 187, 188 (4th Cir. Nov. 12, 2013) (per curiam) (affirming dismissal for failure to effect service "for the reasons stated by the district court," where the district court held it had no discretion under *Mendez* to extend the Rule 4(m) deadline absent good cause, and the plaintiff failed to show good cause); *cf. Scott v. Maryland State Dep't of Labor*, 2016 WL 7378091, at *5

---

[8] Unpublished opinions are cited for the soundness of their reasoning; they are not binding precedent.

13

(4th Cir. Dec. 20, 2016) (citing *Mendez* approvingly).[9] Especially since *Chen*, members of this bench have concluded *Mendez* is good law. *See Gbane v. Capital One, NA*, 2016 WL 3541281, at *2 (D. Md. June 29, 2016) (listing District of Maryland cases).

If *Mendez* is still good law, the defendants' motions to dismiss must be granted, unless Rheinstein can show "good cause" for failing to meet the December 12 deadline.[10] Good cause "requires a showing that the plaintiff 'made reasonable and diligent efforts to effect service prior to the 120-day limit,"[11] *Chen*, 292 F.R.D. at 293 (quoting *Quann v. Whitegate-Edgewater*, 112 F.R.D. 649, 661 (D. Md. 1986)), but was thwarted by circumstances beyond his control, *see Hoffman v. Baltimore Police Dep't*, 379 F. Supp. 2d 778, 786 (D. Md. 2005). Other relevant factors may include whether the defendant will be prejudiced and whether the plaintiff asked for an extension. *See Scott*, 2016 WL 7378091, at *5 (outlining factors); *Quann*, 112 F.R.D. at 661 (failure to request extension evidences lack of diligence). Inadvertence or neglect of counsel is not "good cause." *Braithwaite v. Johns Hopkins Hosp.*, 160 F.R.D. 75, 77 (D. Md. 1995).

Here, Rheinstein offers no evidence that might show he "made reasonable and diligent efforts to effect service" before the December 12, 2015, deadline. In fact, he offers no explanation at all for why he failed to act before filing an amended complaint on the day service was due. Nonetheless, Rheinstein contends that "good cause" exists in this case in light of events

---

[9] This court is unaware of any Fourth Circuit opinion after 2010 that endorses the position that a district court has discretion to extend the deadline absent a showing of "good cause." *See Hansan v. Fairfax Cnty. Sch. Bd.*, 405 F. App'x 793, 793–94 (4th Cir. 2010) ("[T]he district court has discretion to extend the [120-day] period" even absent a showing of "good cause."). And even *Hansan* noted that discretion is not unfettered – the district court may only exercise this discretion "if the plaintiff can show excusable neglect for his failure to serve." *Id.* As the Fourth Circuit recently has explained, a plaintiff that fails to meet the deadline for service, and then requests an extension of that deadline after it has passed, must show "excusable neglect" for the failure to obtain an extension. *Martinez*, 578 F. App'x at 194. "Excusable neglect is not easily demonstrated" and requires a showing that the party acted with diligence in attempting to meet the deadline for service. *Id.* (quoting *Thompson v. E.I. DuPont de Nemours & Co., Inc.*, 76 F.3d 530, 533 (4th Cir. 1996)).

[10] The plaintiff bears the burden of proving "good cause." *See Scott*, 2016 WL 7378091, at *3 ("The plaintiff bears the burden of proving adequate service once a motion to dismiss for insufficient service of process has been filed under Rule 12(b)(5).").

[11] Rule 4(m) subsequently was amended to reduce the initial time period for service to 90 days.

that took place *after* that deadline. In particular, he notes that the December 15th court order

granted his request to file an amended complaint and provided that service on the defendants

"shall not be completed" until the amended complaint is unsealed. Rheinstein relied on that

December 15 order "in good faith," providing him "good cause" to wait until the subsequent

unsealing of the amended complaint in February 2016 before effecting service, he suggests.

(Amended Resp. in Opp'n to Boomerang Mot. to Dismiss, 31–32).[12] This argument fails,

because the "good cause" inquiry focuses on pre-deadline events, not post-deadline events. *See*

Fed. R. Civ. P. 4(m) (court must extend the time for service if plaintiff shows "good cause for the

failure" to effect service by the deadline); *Chen*, 292 F.R.D. at 293 (good cause "requires a

showing that the plaintiff made reasonable and diligent efforts to effect service *prior to* the 120-

day limit") (emphasis added); *Giacomo-Tano*, 199 F.3d at *2 ("Generally speaking, in

determining whether to dismiss the complaint for a violation of Rule 4(m), the primary focus is

on the plaintiff's reasons for not complying with the time limit in the first place.").

Rheinstein also suggests "good cause" exists in light of the consequences of dismissing

this case for insufficient service of process. In particular, he claims the defendants were not

prejudiced by the delay in service, whereas dismissal would be "extremely prejudicial" to him

because the FCA statute of limitations may now bar his claims. (*See* Amended Resp. in Opp'n to

Boomerang Mot. to Dismiss 31). But "good cause" does not turn on the implications of granting

a motion to dismiss. *See, e.g.*, *Chen*, 292 F.R.D. at 295 ("The good cause inquiry . . . implicates

the reason for failure to effect service, not the severity of the consequences. Accordingly, it is of

no moment that the statute of limitations may pose a barrier to a new complaint.") (citations and

---

[12] Boomerang urges the court to strike ECF No. 45, which is a "supplemented and corrected" response to Boomerang's motion to dismiss. (Reply, Boomerang Mot. to Dismiss, ECF No. 52, 6). Because it does not affect the outcome, the court will consider the "supplemented and corrected" response submitted by Rheinstein.

quotation marks omitted); *Knott v. Atl. Bingo Supply, Inc.*, 2005 WL 3593743, at *2 (D. Md. Dec. 22, 2005) (good cause inquiry does not turn on the "possibility that Plaintiff's claims will be time-barred if dismissed without prejudice"); *Defreitas v. Montgomery Cnty*, 2014 WL 31885, at *4 (D. Md. Jan. 3, 2014) ("[T]he running of the statute of limitations has no bearing on the good cause inquiry"); *cf.* Mendez, 45 F.3d at 78 (dismissal without prejudice pursuant to Rule 4(m) "does not . . . give the [plaintiff] a right to refile without the consequence of time defenses, such as the statute of limitations"). And even if the defendants here were not prejudiced by the delay, that fact alone would not suffice to establish good cause. *See Chen*, 292 F.R.D. at 293 ("good cause" requires "reasonable and diligent efforts" to effect service before the deadline); *see also Scott*, 2016 WL 7378091, at *5 (listing prejudice to defendant as one of six factors that may be relevant in the context of "good cause" inquiry).[13]

Finally, Rheinstein claims *Mendez* is no longer good law and that the court is not required to dismiss this case even if "good cause" is absent. (Resp. in Opp'n to Wells Fargo Mot. to Dismiss Mem. Law, ECF No. 109-1, 27 n.23). But even assuming Rheinstein is correct on this point, it is well established that the court "would still need to have some reasoned basis to exercise its discretion and excuse the untimely service: the Court must give some import to the rule." *Hoffman*, 379 F. Supp. 2d at 786; *see also Lehner v. CVS Pharmacy*, 2010 WL 610755, at *3 (D. Md. Feb. 17, 2010) (even if *Mendez* is not good law, "this Court will not make a mockery of the time requirements" under Rule 4(m)). Here, there is no such "reasoned basis" to exercise any discretion the court may have, because Rheinstein offers no explanation for his failure. *See id.* (no "reasoned basis" exists where plaintiff "made no effort" to effect service by deadline).

---

[13] In *Scott*, the Fourth Circuit found that relevant factors include whether "1) the delay in service was outside the plaintiff's control; 2) the defendant was evasive, 3) the defendant acted diligently or made reasonable efforts, 4) the plaintiff is <u>pro se</u> or <u>in forma pauperis</u>, 5) the defendant will be prejudiced, or 6) the plaintiff asked for an extension for time under Rule 6(b)(1)(A)." 2016 WL 7378091, at *5.

Setting aside "good cause" and "reasoned basis," Rheinstein makes four alternative arguments for why dismissal pursuant to Rule 12(b)(5) is inappropriate.

First, Rheinstein claims the December 12, 2015, deadline was rendered meaningless once he filed the amended complaint. At that point, service was not required until after the court unsealed the amended complaint and ordered service, he claims. (Amended Resp. in Opp'n to Boomerang Mot. to Dismiss 25). This argument is unpersuasive. In general, filing an amended complaint does not reset the Rule 4(m) service period except as to those defendants newly listed in the amended complaint. *See Lee v. Airgas Mid-S., Inc.*, 793 F.3d 894, 898 (8th Cir. 2015) ("[F]iling an amended complaint in itself does not toll the service period or reset the 120-day clock.") (internal quotation marks omitted); *Bolden v. City of Topeka, Kan.,* 441 F.3d 1129, 1148 (10th Cir. 2006) ("[T]he 120–day period provided by Rule 4(m) is not restarted by the filing of an amended complaint except as to those defendants newly added in the amended complaint."); *Convergence Techs. (USA), LLC v. Microloops Corp.*, 711 F. Supp. 2d 626, 631 n.4 (E.D. Va. 2010) (same); *Jackson v. Alleghany Cty.*, 2008 WL 3992351, at *16 n.7 (W.D. Va. Aug. 28, 2008) (same).

To support his claim that an amended complaint resets the service deadline, Rheinstein relies on *U.S. ex rel. Budike v. PECO Energy*, 897 F. Supp. 2d 300 (E.D. Pa. 2012). There, a relator faced a deadline for service in March 2011. But prior to expiration of that deadline, on November 17, 2010, the court entered an order stating, "Relator's period in which to conclude its investigative work and to further advise the Court of its decision to proceed in this civil action shall be EXTENDED to April 3, 2011 or further order of this Court." *Budike*, 897 F. Supp. 2d at 311–12. The relator took no action until April 8, 2011, when the relator filed an amended

complaint – five days after the April 3, 2011, deadline. The court subsequently ordered unsealing and service of the amended complaint on May 4, 2011, and the relator effected service within 120 days of that May 4, 2011, order. Faced with a motion to dismiss for insufficient service of process, the court rejected the notion that the relator was required to effect service by April 3, 2011. Instead, it concluded the 120-day timeframe started anew on May 4, 2011, in light of the amended complaint. *Id.* 314 & n.17. The relevance of *Budike* here is limited by its unique facts. That decision rested heavily on the fact that the November court order extended the deadline until April 8, 2011, "or further Order of this Court." The *Budike* court then concluded that the May 4, 2011, order establishing a new deadline for service was such a "further Order" of the court. *Id.* The court did not hold, as Mr. Rheinstein now suggests, that an amended complaint automatically resets the service deadline. Especially because the court order at issue here did not contain similar language to the order in *Budike*, the court finds this argument unpersuasive.[14]

Relatedly, Mr. Rheinstein claims the amended complaint "tolled" the deadline for effecting service that would have otherwise applied. He claims "the time for completion of service . . . is tolled when there exists a statutory or rule-based prerequisite to service, for a particular type of complaint, that requires the occurrence of an event beyond the plaintiff's control." (Amended Resp. in Opp'n to Boomerang Mot. to Dismiss 28). Under this theory, Rheinstein appears to suggest that, but for FCA requirements stipulating that a complaint cannot be served until the court so orders, Rheinstein would have both filed the amended complaint and served that complaint on all defendants on December 12, 2015. (*See id.* 29). To support this argument, Mr. Rheinstein relies on *Robinson v. Clipse*, 602 F.3d 605 (4th Cir. 2010). There, the Fourth Circuit noted that *in forma pauperis* plaintiffs cannot serve complaints until the district

---

[14]   The court also notes that in *Budike*, it appears that the court never unsealed and ordered service of the original complaint.

court screens the complaint and authorizes service. Because these court processes are beyond the control of an *in forma pauperis* plaintiff, the Fourth Circuit concluded the time during which this initial screen takes places does not count against the Rule 4(m) deadline for service. *Id.* at 608–09. This holding in *Robinson* has never been extended to FCA cases, and the court sees no reason to do so here. Prior to the December 12, 2015, deadline, Mr. Rheinstein had ample time to serve his complaint, and his failure to take any actions prior to the day of the deadline was not caused by circumstances beyond his control.

Finally, Rheinstein claims dismissal is inappropriate simply because any failing that might otherwise have resulted in dismissal was obviated by the December 15, 2015, court order. The defendants' motions, he claims, are "predicated on the notion that a prior order of the court extending the service period was improvident or in error," and Rheinstein suggests he "had a right to rely upon" the December 2015 order or, relatedly, that the December 15, 2015 order "superseded any earlier orders." (Amended Resp. in Opp'n to Boomerang Mot. to Dismiss 27, 31). This argument also fails. The December 2015 order was granted before the court had the benefit of adversarial briefing. And the court may grant a meritorious motion to dismiss even if it means vacating a prior court order. *See Chen*, 292 F.R.D. at 295 (granting defendants' motion to vacate a prior court order extending the Rule 4(m) deadline because there was no "good cause" for the extension); *see also Mendez*, 45 F.3d at 79 (suggesting courts may vacate prior orders extending deadline for service if no "good cause" for the extension); *Smith v. Ocwen-Loan Servicing LLC*, 2015 WL 4092452, at *2 (D. Md. July 6, 2015) (suggesting that, when plaintiffs fail to meet Rule 4(m) deadlines, courts should provisionally extend the deadline for service but then allow the parties to brief the issue of whether dismissal for insufficient service of process is

warranted).[15] Indeed, I have done so before in the context of disputes over the application of Rule 4(m). *See Huber v. Maxim Healthcare Servs., Inc.*, 2006 WL 533573, at *1 (D. Md. Mar. 3, 2006) (dismissing case for insufficient process – even though a prior court order had extended the deadline for service – after a motion by defendant showing absence of "good cause").[16]

## II.    Public Disclosure Bar

The FCA contains a public disclosure bar, 31 U.S.C. § 3730(e)(4), "to prevent 'parasitic' *qui tam* actions in which relators, rather than bringing to light independently-discovered information of fraud, simply feed off of previous disclosures of government fraud."   *U.S. v ex rel. Siller v. Becton Dickenson & Co.*, 21 F.3d 1339, 1347 (4th Cir. 1994). The public disclosure bar requires a complaint to be dismissed where there is a qualifying public disclosure that pre-dates the complaint and the relator is not the "original source" of the information. 31 U.S.C. § 3730(e)(4). In large part, this case is a paradigmatic example of a "parasitic" suit, as illustrated by the procedural history set forth above and a comparison of the initial and amended complaint.

In the initial complaint, filed June 20, 2012, Moore conceded that his first knowledge of the alleged scheme originated from publicly-filed documents in state court litigation related to the 2138 Hollins Street property. (Compl. ¶ 20). He then identified, largely on "information and

---

[15] Relatedly, Rheinstein claims his amended complaint was an "implicit motion" to extend the December 12, 2015, deadline for service and that the court granted this "implicit motion" in its December 15, 2012, order. (Amended Resp. in Opp'n to Boomerang Mot. to Dismiss 30 n.21). The court disagrees. Rheinstein also suggests the motion he filed on December 13, 2015, may be viewed as a motion to extend the deadline, and that this motion was timely: because December 12, 2015, was a Saturday, he claims, Fed. R. Civ. P. 6(a) "would have arguably operated to extend any deadlines for action until Monday, December 14, 2015. (*Id.* 27 n.19, 30 n.21). This argument is meritless. *See Gaines v. MKKM Inc.*, 2015 WL 3917160, at *4 (D.S.C. June 25, 2015) (quoting Fed. R. Civ. P. 6 advisory committee's notes). Even construing the December 13 filing as a motion for extension, it was untimely and, as such, Rheinstein would have to prove both "good cause" and "excusable neglect" in order for the court to grant it, which he has failed to do. *Martinez*, 578 F. App'x at 193–94.

[16] The court notes that Rheinstein has displayed a pattern of not meeting deadlines throughout this litigation. For instance, with respect to the motion to dismiss filed by Cardinal, Rheinstein was granted multiple extensions for filing his response and, when he filed a response on September 16, 2016, it was subsequently revised about a week later. (*See* Amended Resp. in Opp'n, Cardinal Mot. to Dismiss).

belief," a total of 27 properties involved in the alleged scheme, for which Cardinal was alleged to be the mortgage lender, and he also claimed that Cardinal certified 25 of the transactions to HUD for FHA mortgage insurance and assigned nearly all of the mortgages to Wells Fargo. In the amended complaint, filed December 12, 2015, Rheinstein identified in more detail his October 2011 discovery of the supposedly fraudulent HUD-1 statement in connection with the state court litigation. (*See* Am. Compl. ¶¶ 95–105). He also added more factual detail about the 2138 Hollins Street property and again relied on "information and belief" to assert that the other 26 transactions also were fraudulent. The amended complaint also described the criminal cases pursued by the U.S. Attorney's Office in this court, acknowledging that the plea agreement for Alberic Agodio covered all the transactions in this case.

The FCA's public disclosure bar was amended effective March 23, 2010. Because the amendment was not retroactive, the pre-amendment bar applies to conduct that occurred before March 23, 2010, and the post-amendment bar applies to conduct after that date. *May v. Perdue*, 737 F.3d 908, 914 (4th Cir. 2013). If a complaint alleges a continuing course of fraud occurring both before and after March 23, 2010, the pre-amendment version governs conduct occurring before that date, and the post-amendment version governs conducts occurring thereafter. *See United States v. Premier Educ. Grp., L.P.*, 2016 WL 2747195, at *7 (D. N.J. May 11, 2016).

In this case, the pre-amendment bar appears to apply to Case Nos. 1–16 alleged in the amended complaint, which involve real estate transactions that were certified for FHA insurance before March 23, 2010, and the post-amendment bar appears to apply to Case Nos. 17–27, which

were certified after that date.[17] The pre-amendment version of the bar was jurisdictional, and provided:

> [n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative ... report, hearing, audit, or investigation ... unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. 3734(e)(4)(A) (2006). The pre-amendment version of the public disclosure bar thus requires the court "to answer three questions: Was there a public disclosure? If there was a public disclosure, was the *qui tam* action based on the public disclosure? If the action was based on the public disclosure, was the *qui tam* plaintiff an original source?" *U.S. ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.*, 528 F.3d 292, 299 (4th Cir. 2008), *rev'd on other grounds by* 559 U.S. 280 (2010). "A relator bears the burden of proving that the public disclosure bar does not preclude his FCA action." *May*, 811 F.3d at 640.

The post-amendment version of the bar "is a grounds for dismissal – effectively, an affirmative defense – rather than a jurisdictional bar." *United States ex rel. Beauchamp v. Academi Training Ctr., LLC*, 816 F.3d 37, 40 (4th Cir. 2016). It provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed— (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal

---

[17] The court recognizes that any manner of determining which specific portions of the alleged fraudulent scheme occurred before March 23, 2010, and which occurred after that date, is necessarily inexact because the amended complaint contains few specific dates. However, the FAC does provide exact closing dates for the subject transactions. The closing date is not a perfect stand-in for wrongful conduct allegedly committed in connection with that transaction: for instance, the mortgage transaction in Case No. 19 closed on April 29, 2010, but Cardinal did not submit the final documentation to the federal government until May 10, 2010. (Am. Compl. 35). Nonetheless, the court adopts the closing dates as the best available option for roughly determining which fraud occurred before March 23, 2010, and which occurred after that date, such that the court can apply the two distinct public disclosure bar analyses.

report, hearing, audit, or investigation; or (iii) from the news
media, unless the action is brought by the Attorney General or the
person bringing the action is an original source of the information.

With respect to Case Nos. 1–16 – which are analyzed under the pre-amendment version
of the public disclosure bar – documents disclosed in state-court litigation qualify as "public
disclosures," *Siller*, 21 F.3d at 1348, 1350, and Rheinstein admits his claims are "based upon"
documents obtained through public state court filings. (*See* Compl. ¶ 20). Rheinstein's affidavits
(as well as the amended complaint) also suggest that the public filings, specifically the two
different HUD-1s, constitute the disclosure of "allegations or transactions" – as opposed to mere
"information" – because the two different forms establish the "x + y = z" implication of fraud.
*See U.S. ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 653–55 (D.C. Cir.
1994) (a "transaction" reflecting fraud occurs when two documents are disclosed from which
readers could infer fraud has been committed). Under Fourth Circuit precedent, this established
both prongs of the public disclosure bar. That is, Moore or Rheinstein also do not qualify as an
"original source" because their knowledge of fraud is based on public disclosures in state court.
*See Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 582–83 (4th Cir. 2000). Accordingly,
to the extent the initial complaint adequately stated a claim against any defendant, claims based
on conduct prior to March 23, 2010 are barred.[18]

---

[18] The court concedes some ambiguity in the record with respect to whether both versions of the HUD-1 forms, or
only the allegedly "accurate" version, were disclosed in state court. On the one hand, Moore and Rheinstein appear
to concede their knowledge of fraud was derived from disclosure of documents in state court. (*See* Rheinstein
Affidavit ¶ 10, ECF No. 34) ("The Qui Tam Cases were based upon information we discovered in the course of
other litigation."); (Am. Compl. ¶ 78 n.7) ("The Relator discovered the transactions at issue in this case in the course
of litigation" in state court.). When Cardinal asserted in its motions papers that both versions were disclosed in state
court, Rheinstein did not object. Then, in a footnote in a brief filed in response to Jewell's motion to dismiss,
Rheinstein claims the "false" version of the HUD-1 form was not publicly disclosed in state court litigation, but
rather was "produced privately and promptly shared with the Government." According to Rheinstein, this second
document was thus not publicly disclosed. (Resp. in Opp'n, Jewell Mot. to Dismiss 19 n.20). Regardless, Rheinstein
bears the burden of proving the public disclosure bar does not apply, and he has not met that burden here.

With respect to claims based on conduct after March 23, 2010, the court applies the post-amendment version of the public disclosure bar. Here, the bar applies if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" before the filing of a *qui tam* action in a federal criminal hearing, unless the person bringing the action is an "original source." And an "original source" is an individual who either "prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4).

First, the amended complaint controls here when deciding whether a public disclosure has occurred prior to the filing of a *qui tam* lawsuit. The original complaint did not particularly allege the relevant fraud – rather, it made vague allegations upon "information and belief." *See Beauchamp*, 816 F.3d at 46. Second, publicly filed federal criminal documents, particularly the plea agreements in the *Campbell*, *Miles*, and *Agodio* cases, are qualifying "public disclosures" that occurred before Rheinstein filed his amended complaint in December 2015. Third, many of the specifics in the amended complaint are provided by reference to these plea agreements in the criminal cases involving defendants Campbell, Miles, and Agodio. (*See* Am. Compl. ¶¶ 190–208 & Exs. 18, 19, 20). Put differently, the same "allegations or transactions" at issue in the criminal cases were then included in this *qui tam* action. Finally, Rheinstein and Moore are not "original sources" under the post-amendment bar. Moore and Rheinstein have proffered no knowledge that is "independent of and materially adds to" the information contained in the plea agreements,

nor have they specifically alleged that they provided the relevant information to the government prior to filing the amended complaint.[19]

Accordingly, to the extent the specifics required by the FCA are contained only in the amended complaint, all claims would fall under the public disclosure bar. *Beauchamp*, 816 F.3d at 45–46. And because the original complaint contains no specifics, but rather makes allegations based on information or belief, the court finds the public disclosure bar applies to all claims. Because the application of the public disclosure bar with respect to Case Nos. 17–27 is not jurisdictional, however, the court will now examine other issues raised by the defendants.

III.     Estoppel as to Cardinal and Wells Fargo

As discussed more fully below, Rheinstein continues to support his claims against Cardinal and Wells Fargo primarily on the grounds of "information and belief," though his obligation is to allege specific facts establishing the necessary scienter for a violation of the FCA. Rheinstein also, however, has attached to the amended complaint the statement of facts agreed to between the U.S. Attorney's Office and Alberic Agodio, who pled guilty before Judge James K. Bredar in *United States v. Agodio*, 1:15-cr-0061-JKB.[20] (Am. Compl. Ex. 20, Agodio Plea Agreement, Attachment A, Agodio Statement of Facts, ECF No. 21-20). Rheinstein acknowledges that the 27 transactions involved in this case are a "subset" of the 35 transactions included in the *Agodio* plea deal. (Am. Compl. ¶ 206). And the plea deal clarifies that the United

---

[19] The amended complaint alleges only that Moore and Rheinstein "first reported information about the fraudulent scheme at issue" in the *qui tam* action "to the Government beginning on or about November 1, 2011," (Am. Compl. ¶ 51), and that the relator "reported the matter extensively to the U.S. Department of Housing and Urban Development (HUD) and the U.S. Attorney's Office in Baltimore beginning on or about November 1, 2011," (*id.* ¶ 23 n.3). However, Moore and Rheinstein provide no specifics as to the nature of those conversations.

[20] He also has included information related to the criminal cases against Kevin Campbell and Jonathan Miles, which are 1:12-cr-0618-JKB-1 and 1:14-cr-0325-JKB-1, respectively.

States identified Cardinal as a victim, along with the secondary lenders and the FHA. The

Statement of Facts explains that:

> Beginning in approximately June 2009 and continuing thereafter until approximately November 2010, defendant Alberic Okou Agodio, together with Kevin Campbell, and others, engaged in a conspiracy and scheme to defraud a mortgage lending business known as Cardinal Financial Company, Ltd. Partnership (Cardinal) …. These actions caused Cardinal, which received the completed loan packages from Transatlantic, to extend financing on these transactions when it would not have done so had it known the true facts. Agodio's actions likewise caused the FHA to issue mortgage insurance on these properties and the secondary lenders to purchase the loans from Cardinal following the closings, thereby exposing Cardinal, the secondary lenders, and the FHA to levels of financial risk that were far higher than they had reason to expect.

(Agodio Statement of Facts 1–5). Rheinstein stands in the government's shoes and has no claim

other than that on behalf of the government. *U.S. ex rel Barajas v. Northrop Corp.*, 147 F.3d

905, 910 (9th Cir. 1998).  Where the government has acknowledged Cardinal and the secondary

lenders as innocent victims in a public filing before this court, for the purpose of persuading the

court to accept a guilty plea, it could not now reverse course and claim that Cardinal and Wells

Fargo had perpetrated the fraud scheme against the FHA.[21] Nor can Rheinstein do so on the

government's behalf.

IV.     Failure to Satisfy Rule 9(b) as to Cardinal and Wells Fargo

To withstand a motion to dismiss with respect to an FCA claim, the plaintiff must plead

facts with sufficient specificity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. *See*

*U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455–56 (4th Cir. 2013); *U.S. ex*

*rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 854–57 (D. Md. 2013). Most of the

---

[21] The agreed-upon statement of facts also would not support an inference that Cardinal or Wells Fargo acted with deliberate ignorance or reckless indifference to the truth as required under the FCA. *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010).

allegations against Cardinal and Wells Fargo in the FAC are supported only on "information and belief," which is not sufficient. Essentially, Rheinstein simply asserts that Cardinal must have known that statements allegedly made by others involved in the transactions were false, and that Cardinal was acting on behalf of Wells Fargo, and that fraudulent claims must have been submitted to the FHA. He has largely failed to provide any of the essential time, place, or date specifics as to these defendants. *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). Further, facts sufficient to establish that Cardinal was an "agent" of Wells Fargo have not been pled.[22]

## CONCLUSION

For the reasons stated herein, the court will dismiss Rheinstein's amended complaint. First, the court concludes that the defendants were not properly served, which is grounds for dismissal without prejudice. In addition, or in the alternative if the ruling as to service is not correct, the court will dismiss with prejudice all claims against all defendants that are based on the first sixteen subject transactions (Case Nos. 1–16): the court lacks subject matter jurisdiction over these claims under the pre-amendment version of the public disclosure bar. The post-amendment version of the public disclosure bar also bars all claims based on the remaining subject transactions (Case Nos. 17–27), and they also will be dismissed with prejudice. With respect to Cardinal and Wells Fargo, the court will additionally dismiss all claims with prejudice, because Rheinstein is estopped from bringing those claims. Separately, the court also finds that

---

[22] In his opposition to Wells Fargo's motion to dismiss, Rheinstein claims Cardinal was an "agent" of Wells Fargo. (Resp. in Opp'n to Wells Fargo Mot. to Dismiss 11). Rheinstein cannot amend his pleadings through his opposition to the Wells Fargo motion to dismiss. *See Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991). Rheinstein also suggests that "any pleading deficiencies" could be corrected through a further amendment to his amended complaint. (*See* Resp. in Opp'n to Wells Fargo Mot. to Dismiss 24 n. 21). But Rheinstein has not formally asked the court for leave to amend nor submitted a proposed amended complaint. In any event, based on the record, the court sees no likelihood that the complaint could be amended so as to state a claim against Cardinal or Wells Fargo.

Rheinstein has failed to plead facts with sufficient particularity with respect to Cardinal and Wells Fargo.

Accordingly, the court will grant the motions to dismiss filed by Boomerang, Svehlak, Wells Fargo, Cardinal, Ronald Miles, Jonathan Lee Miles, and Kathryn Jewell. It will deny Cardinal's motion to strike the amended response filed by Rheinstein as moot. It will retroactively grant the motion by Rheinstein for an extension of time to respond to the motion to dismiss by Jonathan Lee Miles. And it will grant Jewell's motion to amend her pleading to incorporate defenses raised by other defendants.

A separate order follows.[23]

<u>March 28, 2017</u>                                        <u>            /S/            </u>
Date                                                   Catherine C. Blake
                                                       United States District Judge

---

[23] Several defendants have urged the court to award them their fees and expenses pursuant to 31 U.S.C. § 3730(g). (*See, e.g.*, Boomerang Mot. to Dismiss Mem. Law 27). Rheinstein has not responded in substance to these claims for fees. (*See, e.g.*, Amended Resp. in Opp'n, Cardinal Mot. to Dismiss Mem. Law 61, ECF No. 102-1). In any event, the court makes no decision on this issue at this time, because further briefing would be required.